No. 21,398.

THE STATE OF KANSAS, *Appellee*, v. W. P. FLEEMAN, *Appellant*.

SYLLABUS BY THE COURT.

1. WHITE SLAVE LAW—*Regularly Enacted.* Chapter 179 of the Laws of 1913, commonly known as the white slave law, was regularly enacted.

2. PRELIMINARY EXAMINATION—*Accused Held for Offense Not Charged in Warrant—New Complaint.* A person arrested on a warrant based on a complaint charging one felony may be bound over for another felony shown to have been committed by the evidence adduced at the preliminary examination. When this occurs it is not necessary or proper to file a new complaint.

3. SAME—*Waiver by Defendant.* The proceedings at a preliminary examination considered, and *held*, the defendant waived the right to introduce evidence.

4. WHITE SLAVE LAW—*Information—Not Bad for Duplicity.* Section 2 of the act referred to creates a single offense, and an information is not bad for duplicity which charges a person with keeping and maintaining, and assisting in keeping and maintaining, a place where all the immoralities named in the act are practiced, permitted, and allowed.

5. SAME—*Valid Information.* A motion to quash an information drawn under the section referred to, on the ground of indefiniteness and uncertainty, considered, and *held*, the matters complained of did not affect the defendant's substantial rights.

6. SAME—*Amendment of Information.* An amendment of the information in a matter of form was properly allowed at the trial.

7. SAME—*Amendment of Information—Reverification.* After the amendment the information was reverified. The reverification was unnecessary, and did not furnish ground for quashing the information.

8. SAME—*Evidence of General Reputation of Place.* General reputation of the place described in the information was admissible.

9. SAME—*Impeachment of Defendant.* The evidence considered, and *held*, sufficient ground for impeaching the defendant was laid, prejudicial error was not committed in striking out the answer to a question propounded to a witness, and proper foundation was not laid for assigning error on a ruling sustaining an objection to evidence.

10. NEW TRIAL—*General Reputation of Witness—Diligence.* The general reputation for truth and veracity of a witness for the state whose name is regularly indorsed on the information should ordinarily be discovered before the trial.

11. SAME—*Newly Discovered Impeaching Evidence.* It is not error to deny a new trial desired for the purpose of producing newly discovered impeaching evidence.

12. SAME. The finding of the district court, on affidavits contradicted by oral testimony, respecting the merits of a motion for a new trial will not be disturbed on appeal.

Appeal .from Montgomery district court; JOSEPH W. HOLDREN, judge. Opinion filed March 9, 1918. Affirmed.

*Harold McGugin,* of Coffeyville, *F. W. Mahin,* and *I. M. Mahin,* both of Smith.Center, for the appellant.

*S. M. Brewster,* attorney-general, *Thurman Hill,* county attorney, and *George D. Higgins,* assistant county attorney, for the appellee.

The opinion of the court was delivered by

BURCH, J.: The defendant was convicted of maintaining a place where prostitution was practiced, contrary to the provisions of section 2 of chapter 179 of the Laws of 1913 (Gen. Stat. 1915, § 3647), miscalled in extravagant newspaper phrase "the white slave law."

The defendant contends the matter published in the statute book never became a law.

The original bill was house bill No. 40. It was amended in committee of the whole according to the recommendation of the judiciary committee, and was passed by the house on January 23, 1913. The bill was amended in the senate, and was passed, as amended, on February 13. On the evening of February 13 the bill was returned to the house. At the morning session of February 14 the house nonconcurred in the senate amendments and asked for a conference. Conferees agreed on a report. The senate amendments materially changed section 1 and slightly modified section 6. The conference report eliminated the senate amendments to section 1, and accepted the senate amendments to section 6. The conference.report was adopted by both houses on February 21. The enrolled bill, duly authenticated by the presiding officer of each house, was approved and signed by the governor on February 25. The secretary of state received the enrolled bill on March 1, and it was published in the official state paper on March 3. Indorsements on the enrolled bill show the passage of the bill in each house, with the date, and the

adoption of the conference report by each house, with the date.

There are in the office of the secretary of state two documents, each purporting to be original house bill No. 40. To one the report of the house judiciary committee is attached. The legislative history indorsed on the back stops with the action of the house committee of the whole, recommending the bill for passage as amended by the judiciary committee. The other document, starting with the same matter, has the senate amendments attached to it. The legislative history indorsed on the back is complete, including an indorsement of the adoption of the conference report by each house, and the conference report made to the house, where presumably the bill remained after return from the senate, is attached. On the back of this document is an indorsement, in two kinds of ink and two styles of writing, indicating a changé by addition. It now reads as follows, the original matter being italicised:

> non
> "*House* ∧ *concurred in senate amendment* Conference asked."

The senate journal contains a message received from the house on February 21, that the house had concurred in the senate amendments to house bill No. 40. The senate journal contains no message of nonconcurrence from the house, and contains no record of the appointment of senate conferees. In the secretary of state's office is an enrolled bill, duly authenticated, and signed by the governor on February 25, containing the senate amendments. On the document is indorsed passage by the house on January 23, passage by the senate on February 13, and the following: "House concurred to senate amendments February 21, 1913." This document was received by the secretary of state on February 26, and was published in the official state paper on February 27.

An enrolled bill is well-nigh conclusive evidence of the action of the legislature. In this instance each enrolled bill is as complete, perfect, and authentic as the other. Each one provided it should take effect on publication in the official state paper. The constitution reads as follows:

"The legislature shall prescribe the time when its acts shall be in force, and shall provide for the speedy publication of the same; and

The State v. Fleeman.

no law of a general nature shall be in force until the same be published."
{Art. 2, § 19, Gen. Stat. 1915, § 159.)

The enrolled bill containing the senate amendments was published on February 27, and became effective, if at all, on that date. The other was of no force until published. It was published on March 3. If the two bills are so inconsistent that both cannot stand, and they probably are, the one published on March 3 is the later enactment and the law. If they are not inconsistent, the defendant was prosecuted under the later law.

The defendant appeals to other evidence than the enrolled bill to show that the law contained in the statute book was not passed. The only competent evidence is the journal which the constitution requires each house to keep and publish. To overcome the verity of an enrolled bill the legislative journals must clearly and affirmatively establish its invalidity. In this instance the legislative journals clearly and affirmatively establish the validity of the enrolled bill which omits the senate amendments to section 1.

The legislative proceedings are regular until house bill No. 40 was returned to the house with the senate amendments. The senate journal shows a communication from the house stating the amendments were agreed to. The house journal, however, affirmatively shows prompt nonconcurernce, request for conference, appointment of conferees, report of the conference committee, and adoption of the conference report which eliminated the senate amendments. The senate journal merely recorded a communication. It could not constitute the constitutional record of the house proceedings. What the house does is recorded in the house journal, which is the best evidence of its action. Besides this, later in the day on which the house communication was received by the senate, the senate heard the report of its own conferees, and adopted the conference report by a yea and nay vote entered on the journal. This is the final action of the senate, and no matter what may have occurred previously, is conclusive with respect to what the senate did with house bill No. 40. It is true there is no senate record of notice of nonconcurrence by the house, or of the appointment of senate conferees. Inferences from silence and omission, however,

cannot prevail against affirmative declarations of the legislative record.

The two documents reposing in the office of the secretary of state, each purporting to be original house bill No. 40, confirm the legislative record. The one which shows no action beyond that of the house committee of the whole is unimportant. The other is clearly the one from which the enrolled bill was prepared, and faithfully corresponds to the legislative record, including adoption of the conference report by the two houses. The corrected indorsement showing the house action concerning the senate amendments corresponds to the house journal. These documents could not be considered in opposition to the enrolled bill or the legislative journals. They are, however, consistent with both.

The constitution makes no provision for indorsement on an enrolled bill of any portion of its legislative history. The presiding officers of the two houses sign it, and that is all. The action of each house is shown by its journal. Therefore, the notation on the enrolled bill containing the senate amendments, "House concurred to senate amendments February 21, 1913," is no part of the bill, and is not the best evidence of what the house did.

The clear and affirmative evidence which establishes the regularity of the enrolled bill which omits the senate amendments excludes all reasonable probability of the other having been passed. The theory of the defendant is, the house in fact concurred in the senate amendments. The enrolled bill was made up accordingly and sent to the governor. A vigilant lobby discovered what had been done and protested so vigorously that some legislative commotion ensued, which led to shuffling of documents and records and the promulgation of an act which had not been passed. The court is bound by the records showing the house did not concur in the senate amendments, and showing the senate receded from the amendments which caused the disagreement. If there could have been more than one house bill No. 40, or if there were but one enrolled bill based on house bill No. 40, some presumptions might reasonably, perhaps necessarily, be indulged. As the matter stands, any presumption resorted to to sustain one enrolled bill could be indulged to sustain the other, and the bill last published would be the law.

The State v. Fleeman.

The court holds the defendant was prosecuted under a statute regularly enacted.

The information contained two counts. The defendant was convicted on the second count only, the nature of which has been stated, and the first count is no longer material. The defendant complains because his plea in abatement, grounded on the fact he had no preliminary examination, was overruled.

A complaint was filed charging the defendant with statutory rape. A warrant was issued on which he was taken into custody. Legality of the detention was not contested, and the complaint passed into history. A preliminary examination was held on the charge stated in the warrant. The evidence developed commission of the crime stated in the information, and the defendant was bound over to answer for that crime. The warrant then passed into history. The defendant cross-examined the state's witnesses. When the state rested, the defendant was asked if he was ready to call his witnesses. He said no, but rested. He then demanded a preliminary examination of the offense disclosed by the evidence. When his demand was overruled he offered no evidence and asked for no continuance to enable him to obtain evidence.

The writer of the opinion in the case of *Redmond v. The State,* 12 Kan. 172, ventured the assertion that when a person is arrested for one crime, and on preliminary examination is bound over for another, a new complaint ought to be filed, but said the statute does not require it. The reason the statute does not require a new complaint is that the accused is already in custody, and the complaint has no function to perform except to furnish the basis for a warrant. For forty-five years the legislature has ignored the suggestion, and it may now be regarded, not only as *obiter,* but as defunct *obiter.*

In this instance the county attorney filed a new complaint and had a new warrant issued. They served no purpose whatever, except to afford the defendant opportunity to multiply objections to the regularity of the preliminary procedure. If he had desired, in good faith, to meet the evidence which the state had introduced, he would have been given an opportunity as a matter of course. He chose, however, to stand on the proposition that he had not received the benefit of a prelimi-

nary examination at all, and that he was entitled to a preliminary examination at which he might produce witnesses. The plea in abatement was properly overruled.

The information reads as follows:

"That heretofore and to-wit, on or about the 24th day of January, A. D. 1917, at and within the county of Montgomery and the state of Kansas, the above named defendant, W. P. Fleeman, then and there being, did then and there, wilfully, wrongfully, unlawfully, and feloniously keep and maintain, and assist in keeping and maintaining a brick building located and situated on [lots described], more particularly described as The Oriental Rooms, a place where prostitution, fornication, and concubinage is practiced, permitted, and allowed, and that said above described premises are owned or leased by the said defendant and under his control; all contrary to and in violation of the form of the statutes in such case made and provided, and against the peace and dignity of the state of Kansas."

A motion to quash was overruled. The defendant says he was charged in a single count with numerous felonies—keeping a place where prostitution was practiced, keeping a place where fornication was practiced, keeping a place where concubinage was practiced, and several others. He further says he was bewildered by uncertainty whether he should prepare to meet evidence that he kept the place, or only assisted in keeping it, and evidence that he owned the place, or merely leased it. The statute creates a single offense—keeping a place for unlawful sexual commerce on premises for which the keeper is responsible. The keeping may be by one who keeps, or maintains, or who assists in keeping, or maintaining. The place may be a house, or any other place. The commerce may be prostitution, fornication, or concubinage, and the place may be one distinctively for such commerce, or one where such commerce is practiced, or is permitted, or is allowed. Responsibility for the premises may be by virtue of ownership, or lease, or control. The substance of the offense is keeping a vicious place, and only one offense is committed if all the immoral practices named be indulged there.

One who assists in keeping an immoral resort keeps it to the extent of his participation, although others also participate. Assigning to him the character of assistant does not relieve him of the character of keeper. No distinction is made in procedure or punishment between a keeper sole and an assistant. The gist of the matter to be proved—keeping—is

the same. A charge of keeping would be sustained by proof of assisting, and both capacities may be attributed to the same person without affecting the certainty of the charge.

The defendant might have been charged in one count as owner, as lessee, and as in control of the premises. Sufficient authority over the premises to prevent disreputable practices there is the important thing. If there be any repugnancy between owning and leasing, it would not defeat the information, because the crime would nevertheless be indicated. (Gen. Stat. 1915, § 8024.) It would be useless formality to multiply counts in order to meet contingencies of proof. In this instance the defendant was charged with being in control of the premises described, and it was further charged that he was owner or lessee. He was informed of the nature and cause of the accusation against him. (Bill of Rights, § 10, Gen. Stat. 1915, § 114.) The court could pronounce judgment according to the right of the case (Gen. Stat. 1915, § 8023), and the defendant could not be prejudiced in his substantial rights on the merits. (Gen. Stat. 1915, § 8024.)

At the trial the defendant testified he owned the "Oriental Rooms" and spent all of his time there. Conceding the information was defective, it would be the quintessence of nonsense to reverse the judgment because of the fact, even if there were no statute on the subject. The statute reads as follows:

"On an appeal, the court must give judgment without regard to technical errors or defects, or to exceptions which do not affect the substantial rights of the parties." (Crim. Code, § 293, Gen. Stat. 1915, § 8215.)

The record discloses that none of the exceptions taken to the information affected the defendant's substantial rights.

The code of criminal procedure was framed to supersede the common law with a more rational system. While it is defective in many respects, and in many others exhibits a conservatism which contrasts strongly with its general liberality, it is distinctively modern. The tradition of the common law, however, was so strong that it came near superseding the code. In time the code was rediscovered, and it is the purpose of the court to interpret and apply it according to its true intent and spirit.

The defendant complains because the information was amended at the trial. The amendment consisted in writing the

words "County attorney of Montgomery county, Kansas," under the signature of the county attorney to the verification. The amendment was one of form only, the defendant calls it a matter of form, and the statute expressly authorizes amendments in matters of form at the trial, so the complaint is frivolous.

The statute reads as follows:

"An information may be amended in matter of substance or form at any time before the defendant pleads, without leave. The information may be amended on the trial as to all matters of form, at the discretion of the court, when the same can be done without prejudice to the rights of the defendant. No amendment shall cause any delay of the trial, unless for good cause shown by affidavit." (Gen. Stat. 1915, § 7982.)

How any amendment of form, as distinguished from substance, can ever prejudice a defendant, this court is unable to perceive.

After amending the information the county attorney reverified it, which was wholly unnecessary. The defendant then filed a new motion to quash, which was properly overruled.

The defendant complains because the general reputation of the place was proved. The evidence was admissible for two purposes. It was admissible to prove the actual character of the place. The authorities are divided on this question, but the fact that a house has acquired a general reputation in the community of being an immoral resort is some evidence that it is such. While the evidence may be weak, it is not to be rejected on that account. The evidence was admissible for the purpose of charging the defendant with notice of the character of the place. The person who owns or controls an immoral resort is not likely to be ignorant of what the community knows. Notice was relevant to the issue of permission and allowance.

The defendant complains of some impeaching testimony, because he says the proper foundation was not laid by calling his attention to specific time and place. The question was whether or not the defendant had an arrangement with named girls whom he employed, to send them to men's rooms and divide their earnings on a stated basis. The defendant told what his arrangement with the girls was. He was then asked if his arrangement was not of the character stated. He vehemently denied such an arrangement, and said he never

hinted such a thing. Under these circumstances he fairly exposed himself to impeachment without going further into details.

A police officer had occasion to go through the defendant's place. He was called as a witness and was asked if the defendant demanded that he have a warrant. He said no, and the answer was stricken out. In view of the abundant, direct, and positive evidence of guilt, it is not likely this answer would have worked an acquittal. The officer was asked a further question, and was not permitted to answer. What his answer would have been was not shown at the hearing on the motion for a new trial.

A motion for a new trial was filed on the ground of newly discovered evidence. The evidence was, bad general reputation for truth and veracity of one of the state's witnesses, and impeaching evidence. The names of witnesses are indorsed on the information so that the defendant may look up notorious facts like general reputation, and the rule is well established that it is not error to deny a new trial desired for the purpose of producing newly discovered impeaching evidence. The witness for the state who was called in rebuttal to impeach the defendant made an affidavit in which she repudiated the testimony which she gave at the trial. The defendant says he relies on the case of *The State v. Keleher,* 74 Kan. 631, 87 Pac. 738. The Keleher case was a very exceptional one. The present case belongs to a very common class. At the hearing the state contested the motion for a new trial. After hearing all the evidence introduced the court found against the defendant. Nothing appears to indicate the ordinary rule should not be applied. (*The State v. Baker,* 78 Kan. 663, syl. ¶ 2, 97 Pac. 785.)

The judgment of the district court is affirmed.