No. 27,536.

THE STATE OF KANSAS, *Appellee*, v. WILLIAM BIRZER, *Appellant.*

(268 Pac. 842.)

Opinion filed July 7, 1928.

*R. C. Russell,* of Great Bend, *Jerry E. Driscoll,* of Russell, and *Guy L. Hursh,* of Topeka, for the appellant.

*William A. Smith,* attorney-general, *Roland Boynton,* assistant attorney-general, *Wayne Lamoreaux,* county attorney, *Ed. Rooney,* of Topeka, *B. H. Asher* and *D. A. Banta,* both of Great Bend, for the appellee.

The opinion of the court was delivered by

HARVEY, J.: William Birzer was charged with shooting at named persons, with intent to kill, under R. S. 21-431, and was found guilty of endangering the lives of such persons under circumstances which would have constituted murder or manslaughter if death had ensued,

under R. S. 21-435. He has appealed, and contends that the evidence does not support the verdict, and that under the showing made a new trial should have been granted.

On the evening of September 5, 1927, Mary Zecha, a young woman about nineteen years of age, who resided with her parents on a farm about three miles southwest of Ellinwood, Kan., and five other young people of the neighborhood, drove to Ellinwood and attended a picture show. They were riding in a Lincoln touring car. As they were returning home about 10:30 o'clock, and when they were perhaps a mile from town, some one drove up behind them and fired a shotgun into the car in which they were riding, seriously wounding Mary Zecha and two other occupants of the car. This shooting formed the basis of the complaint against appellant. The evidence tending to show that appellant did the shooting may be summarized as follows: He had been acquainted with Mary Zecha for about three years, and had kept company with her for a year and a half. About six months prior to the shooting he had proposed marriage to her and had not been accepted. At that time, however, the parties agreed to be friends and to see each other occasionally. Appellant was of an exceptionally jealous disposition and complained that Mary Zecha was in the company of other young men. In October, 1926, she attended a social function in company with Earl Batchman. Appellant went to Mr. Batchman and said that he was going with Mary, and that Mary's father didn't like for her to go with anyone else, and that he had run some boys off with a shotgun. Some time shortly before harvest, 1927, Leonard Link accompanied Mary Zecha to the picture show on one occasion, and to a dance on another. Appellant was very angry about that. He complained to Link about intruding, and said to him: "If I ever find you up in this neighborhood again, God help you." He also complained to Mary Zecha about it, and went to her father on three or four different occasions and talked with him about it. He complained that Link was taking Mary away from him; that Link was dropping in and talking with her where she worked, and said, among other things: "I can't stand it any longer. . . . The whole country is talking about it." On the evening of September 4 Mary Zecha and her two sisters drove into Ellinwood. Appellant saw them and wanted to speak to Mary. She told him she was too busy. A little later the girls started to go to the picture show. He walked along with them. One of the girls

started to buy the tickets; he stepped in and bought tickets for all of them and then excused himself. The girls went into the show. Later he came to the show and took a seat by the side of Mary. After the show he and Mary walked out together and sat in a car and talked for some time, perhaps an hour. It was raining. Their friendship had not been especially pleasant, and they talked of some matters concerning which they had arguments. The talk ended in a final breaking off of their courtship. She testified:

"Q. Now just what was it you said to him to give him to understand your separation was final? A. Well, you mean that evening?

"Q. Yes. A. When he asked me for a date Sunday night I said 'No,' and for Monday I said 'No,' and he said 'Any time?' and I said, 'Absolutely not.'"

She then got out of his car and got into her father's car and went home with him. This was on Saturday evening. On Sunday evening some young people from the neighborhood and one or two who were visiting there met at the Zecha home and concluded to go to town to the picture show. There were ten of the young people. Four of them rode in a Ford coupé and six of them in the Lincoln touring car. They got to town a little before the show started, drove about town a few minutes, parked their cars and went to the show. After the show was out, about ten o'clock, appellant was seen watching the automobiles in which these young people went to town, as though watching to see who got into the cars. The young people soon after the show was out drove to one of the drug stores, where they ordered refreshments, which were served in the cars, and were there perhaps twenty minutes. Defendant was seen to get into a car and drive out north, which was toward his home. Later, and about the time the young people started home, he and another young man were seen to get into his car, a Ford touring car of an early model, and start to drive south, following the car in which Mary Zecha and her friends were riding. In the car in which defendant was riding there was something sticking from the side, as much as a foot or a foot and a half, which looked like the barrel of a gun. The road from Ellinwood to the Zecha home was south to an east and west road and then west. The young people went south, but when they reached the east and west road they turned east and drove for about a mile, turned around and started to drive west. The young people in the Ford coupé pretended they were out of gasoline and stopped. The Lincoln car also stopped. While they were there a Ford touring car, with the lights out, passed by them, going east, at a speed of

about thirty miles per hour. The young people had started west, and soon one or more of them noticed a car, without lights, approaching them from behind. When it got almost to them its lights were turned on, and almost instantly the shot was fired from it into the Lincoln touring car. The car from which the shooting was done then turned around and drove rapidly away. It was a Ford touring car. A day or two after this, when appellant was in company with another boy, one of them was heard to say: "If we get by with it we will be lucky."

Immediately after the shooting the young people in the Lincoln car went back to Ellinwood to the doctor's office, and from there to Great Bend, where X-rays were taken, and then went to their homes. The next morning appellant, his father and brother Joe, went to the Zecha home. There appellant made no inquiry as to how the injury occurred, nor did he talk about it. His brother and father talked and asked questions. Mary Zecha, her sister, who was also injured, and their father were going to town to have the injuries treated. Appellant said he would take them in his brother's car, and did so. On that day he stated to Mary Zecha, or her father, or both, that the evening before he had been in town until after the show was out, then went to the drug store and got him a drink, and went directly home, about ten o'clock. A few days later he told the sheriff that he left Ellinwood about ten o'clock to drive to Great Bend, where he was to meet some one and get a pint of whisky, but that he had got stuck in the mud and high water on the road, and was there for nearly two hours; did not get to Great Bend, but returned to his home, getting there about midnight. There was other evidence that he reached home about midnight that night. Within the two or three days after the shooting, in talking to Mary Zecha's father and to others, he stated, as many as three or four times, in substance, that the person who did the shooting would never be apprehended; that there were no clues; that the thing had been shrewdly planned, and that it would not be possible to learn who did it. When he and his father together were questioned as to whether they had a shotgun at their home, both of them stated that they had none. A day or two later appellant's father told the sheriff he wanted to correct that statement; that they did have an old gun at the place which he thought of as junk, and which was kept out at a workshop and garage on the place. The sheriff went there to find it.

It was not in the workshop proper, but was in the loft, where it was dark and where a flashlight had to be used to find it. When found there was fresh mud on the stock, and one barrel of the gun had been recently fired. We think this evidence justified the jury in concluding that appellant is the person who fired the shot.

George Stroh was one of the important witnesses for the prosecution at the trial. After the trial he went to Colorado, and there appellant's brother saw him, and he made an affidavit in which he recanted much of his testimony damaging to appellant which he had given at the trial. This affidavit was offered in support of the motion for a new trial. Some other affidavits were offered, but the matter contained in them was impeaching or cumulative to such an extent that the court would not be justified in granting a new trial by reason of them. As a reason or excuse for recanting his testimony by his affidavit, Stroh stated that he had not been sworn when he testified at the trial. The transcript of the record shows that he was sworn, and witnesses testified to that fact. Appellant contends that the court should have granted a new trial because of Stroh's affidavit, and cites and relies on *State v. Keleher,* 74 Kan. 631, 87 Pac. 738, and allied cases. That case was an exceptional one. (*State v. Fleeman,* 102 Kan. 670, 171 Pac. 618.) Under our present code of procedure the court, rather than the jury, passes on the evidence offered by affidavit, or otherwise, in support of a motion for a new trial. (*State v. Turner,* 121 Kan. 364, 247 Pac. 427; *State v. Stach,* 116 Kan. 187, 226 Pac. 238.) We had occasion to consider the question in *State v. Buton,* 124 Kan. 509, 260 Pac. 634, where it was held:

"The recantation of his testimony, by a witness for the prosecution in a criminal case, does not necessarily entitle defendant to a new trial. Whether it does so or not depends on all the facts and circumstances disclosed by the evidence in the case, including that offered on the motion for a new trial." (Syl. ¶ 1.)

At 33 A. L. R. 550 a number of cases are collected in which the courts have dealt with the affidavits or testimony of recanting witnesses offered on a motion for a new trial. It is said in the note:

"As a general rule the court will not grant a new trial on statements by a witness after a criminal trial tending to show that his testimony was perjured, whether the witness himself makes oath to the statement or not."

Here the trial court had heard the evidence in the case, including the testimony of the witness Stroh, and also considered the affidavits offered on the motion for a new trial. The court might very

well have believed that Stroh testified truthfully on the trial rather than in his affidavit. If he so believed he was justified in overruling the motion for a new trial. Appellant argues that the testimony of Stroh was essential to the conviction. We do not so regard it. There was much other material evidence which tended to support the verdict.

The judgment of the court below is affirmed.