No. 46,909

STATE OF KANSAS, *Appellee*, v. ROBERT GREEN, *Appellant*.

(508 P. 2d 883)

Opinion filed April 7, 1973.

*Lynn R. Johnson,* of Schnider, Shamberg and May, of Kansas City, Kansas, argued the cause, and *Charles S. Schnider,* of the same firm, was with him on the brief for the appellant.

*Margaret W. Jordan,* district attorney, argued the cause, and *Vern Miller,* attorney general, and *James A. Wheeler,* former county attorney, were on the brief for the appellee.

The opinion of the court was delivered by

FOTH, C.: This case concerns the responsibility of a trial court when the state's prime witness in a murder case recants his trial testimony after a guilty verdict has been returned and sentence has been pronounced.

On December 16, 1970, a jury found Robert E. Green, the

defendant-appellant, guilty of first degree murder. After a suicide attempt in the county jail, he was referred to the Larned state hospital for determination of his mental condition at that time. In due course he was returned to the court with a report that he was capable of understanding his position and assisting his counsel in further proceedings in the case. On March 29, 1971, his motion for a new trial was overruled and he was sentenced to life imprisonment.

On May 21, 1971, a supplemental motion for a new trial was filed, based in part on a claim of newly discovered evidence. A hearing was held on this motion on June 29, 1971, at which the recanting testimony in question was presented. The following day the motion was overruled, and this appeal followed. The sole issue before this court is whether the trial court erred in this final ruling, denying the supplemental motion for a new trial.

Because of the narrowness of the issue presented much of the trial evidence is omitted from the record. While a detailed account of the sordid affair on which the conviction is based is unnecessary to our decision, a brief summary of the principal testimony is required to appreciate the ruling complained of.

The recanting witness was one Larry Frames, in the summer of 1970 a young man of twenty-four years. He and the twenty-two-year-old defendant Green were friends of long standing. They both lived in Kansas City, and they had been in prison together. Green had struck up a telephone acquaintance with fifteen-year-old Glenda Williams through the "hot line," an alleged public service operation of a Kansas City radio station whereby callers of the advertised telephone number were able to converse with each other.

On June 2, 1970, the defendant arranged his first date with Glenda, who was to find a date for Frames. Glenda would that night be murdered by choking, beating and drowning. When Frames and Green arrived in Olathe they determined that Glenda's first choice for Frames' date was too young, even for Frames. Eventually they found a sixteen-year-old named Pat and prevailed on her to go riding with them.

The quartet drove around Johnson county for some time, stopping once at a cemetery to tell ghost stories. The girls from time to time asked in vain to be taken home. The inevitable showdown came on a country road near a bridge over a swollen stream.

The girls at first demurred to the demands made upon them and threatened to walk home. Glenda remarked that she had made note of the car's license plate. This prompted a forcible seizure of the girls and their restoration to the car. There the girls were stripped and Frames had intercourse with Pat in the back seat. It is as to the subsequent events that the various narratives differ.

At trial Frames, Pat, and the defendant, all testified that the couples then traded places and the defendant Green unsuccessfully attempted to have intercourse with Glenda. Frames described Green's efforts in graphic detail, Pat said only that Glenda was crying, while Green merely said that Glenda had repulsed his advances.

Frames went on to tell the jury that he and Green then had a discussion of their future actions, and that Green said they'd have to kill the girls. Frames waited on the bridge while Green went back to the car and told Glenda that Frames wanted to talk to her. Glenda went onto the bridge where Frames choked her and then threw her over the bridge and into the water. When he reported back to Green, Green said he'd better make sure. The two of them, according to Frames, went down to the water where the still struggling Glenda was further choked, beaten with a stick, and eventually drowned by Frames' holding her head under while Green held her arms.

Pat, who for some reason survived the evening, testified that Green's comment before Glenda was thrown from the bridge was that he couldn't let her go—she knew too much. Further, that when Frames returned to the car without Glenda, Green asked if he had finished it, and then got out saying he was "going to go make sure." She stayed in the car, and never did see what went on while the two men were down by the stream.

Green's story was that he thought Frames was just going to scare the girls; that he was surprised and shocked when Frames said he had killed Glenda; and that he went down to the stream to see if he could save her, only to find that she was already dead.

In addition to the trial testimony of the three survivors summarized above, the record also reflects that of Frames' married sister. On June 3, 1970, the morning after the murder, her brother called her to come to the house of the defendant's brother. There she found, among others, Frames, Pat, and the defendant. After talking to Frames she went upstairs to talk to the defendant.

According to her, the defendant at that time related how Glenda had refused to "co-operate" with him and had screamed and threatened to call the police. After Green slapped her, Frames threw her off the bridge and reported that he had killed her. Green told her how he went to make sure she was dead, hit her with a stick when he found she was still alive, and eventually held her arms back with her sweater while Frames held her head under water.

At the hearing of June 29, 1971, on the supplemental motion for a new trial, Frames assumed the entire burden of the murder. He reversed his trial testimony in that he now claimed: that it was he, and not Green, who first grabbed the girls and stopped them from walking home; that it was he, and not Green, who first suggested measures to prevent the girls from talking; and that it was he, and not Green, who went back to make sure Glenda was dead.

In his post-trial version Frames also claimed he never told Green he intended to kill Glenda, but only to scare her; that Green was shocked when he heard that Frames had killed her, and wanted to save her; that while Green was positioning the car so its lights would aid the rescue efforts he, Frames, beat and choked her some more in an effort to finish her off; that Green wanted him to stop but he told Green if he interfered he would kill him too; and that despite this threat Green later went into the water to pull Glenda out, only to find that she was dead.

As may be seen, Frames' new testimony constituted a complete about face, absolving Green of responsibility in all the essential elements of the murder. Frames also recanted on two portions of his testimony dealing with events before and after the murder itself. First, he asserted that Green and Glenda were never in the back seat at any time during the evening. At trial, it will be recalled, Frames had given full particulars as to Green's attempted rape of Glenda in the back seat. He now denied this testimony answer by answer. His new testimony contradicted not only his own but that of Pat, who had testified that Glenda was crying while they were back there, and that of Green himself, who had said they were in the back seat for ten to fifteen minutes while he attempted to have intercourse with Glenda. The second peripheral denial involved Green's disposal of one of Glenda's tennis shoes after the survivors got to Kansas City. At trial Frames and Pat had both testified that they saw Green take the shoe out of the house and come back with it. Frames further testified that he had

taken the shoe into the house, and told how Green had said he tried to burn it but it was too wet, so he threw it down a sewer. On the motion for new trial Frames testified that this was all a fabrication—the last time he saw the shoe it was still in the car.

Before giving this last testimony of June 29, 1971, Frames had told of the events in question on at least three prior occasions of which the trial court was aware. The first version was in a statement to investigating officials on June 4, 1970, just two days after the murder. In that statement he placed the major share of culpability on Green, while minimizing his own role. The second was on November 18, 1970, at the time he pleaded guilty to first degree murder for his part in Glenda's death. At that time he was placed under oath and examined and cross-examined about the events of the fatal night. His account then was substantially the same as that given at trial. The third account was, of course, his trial testimony given in December, 1970,

The day after hearing Frames' last testimony the trial court made the following oral ruling (Note: The trial court refers to Frames' trial testimony as having been given on December 4, 1970. This is clearly in error, probably in transcribing the reporter's notes. The trial commenced on December 10, 1970; selection of the jury consumed almost two days; the state opened its case on Friday, December 11; and the case was then recessed until Monday, December 14. The state completed the introduction of its evidence on that day, and rested the morning of the 15th. It seems likely that Frames' trial testimony was given on the 14th, not the 4th.):

"THE COURT: The Court has spent a substantial amount of time since this matter was concluded yesterday afternoon going over the transcripts of the trial of the matter, and in reviewing the defendant's testimony, and having done so, makes the following findings of fact:

"One, the defendant, Robert E. Green, and Larry W. Frames, were close friends for some time prior to June 2, 1970, the date of the occurrence in question and that they are not now on unfriendly terms.

"Two, that Larry W. Frames on June 4, 1970, gave a statement to the police in Kansas City, Missouri and to the prosecutor of Johnson County, Kansas which was substantially different than the testimony of Larry W. Frames at the time he entered his plea of guilty to the crime of murder in the first degree of Glenda Williams on November 18, 1970, before this Court; and which was substantially different than the testimony of Larry W. Frames at the defendant's trial on December 4 [sic], 1970, before this Court.

"Number three, that the testimony of Larry W. Frames, in support of the defendant's supplemental motion for a new trial, is substantially different than his testimony at the trial before this Court on December 4 [sic], 1970.

"Number four, that the testimony of Larry W. Frames is replete with many falsities; among the most glaring falsity is his testimony to the effect that the defendant, Robert E. Green, and the deceased, Glenda Williams, were not on the occasion in question in the back seat of the automobile belonging to the defendant's brother for the purpose of the defendant attempting to rape said Glenda Williams. This testimony is not only inconsistent with the prior testimony of Larry W. Frames, but also is inconsistent with the testimony of the defendant himself, and of the witness, Patricia. . . .

"There are other obvious inconsistencies in the defendant's recanting testimony.

"Number six, that Larry W. Frames had nothing to gain by giving perjured testimony on December 4 [sic], 1970, for the reason that Larry W. Frames had previously entered a plea of guilty to the crime of murder on November 18, 1970, and had received a sentence of life imprisonment.

"Number seven, the Court after observing the demeanor and appearance of Larry W. Frames, finds that the testimony of said Larry W. Frames is untrustworthy and unreliable and is entitled to no weight or credit.

"The Court, after considering all of the testimony and evidence produced, and after observing the demeanor, conduct and appearance of the witnesses produced in support of defendant's supplemental motion for new trial, finds that the testimony of Larry W. Frames is an attempt to carry out a post conviction conspiracy, between the two participants in the murder of Glenda Williams, and is reprehensible.

"The Court concludes, as a matter of law, that the granting of a new trial upon the ground of newly discovered evidence is not viewed with favor, and may be granted only within the cautious discretion of the trial court.

"The Court further concludes that a court is not compelled to give credence to false testimony offered in support of a motion for a new trial.

"The Court further concludes that one who recants his sworn testimony in court necessarily raises a serious question as to his own veracity.

"Further, the Court concludes, as a matter of law, that recantation by witnesses . . . called on behalf of the prosecution does not necessarily entitle the defendant to a new trial, but rather that the granting of a new trial on this ground depends upon all of the circumstances of the case, including the testimony of witnesses submitted on the motion for a new trial.

"The Court determines further, as a matter of law, that recanting testimony is exceedingly unreliable; and it is the duty of the Court to deny a motion for a new trial where it is not satisfied that such evidence is true. This is especially true where the recantation involves a confession of perjury.

"After giving due consideration to the defendant's supplemental motion for a new trial, the Court finds and determines that the motion should be and it is hereby overruled and denied."

In claiming error in this ruling the defendant-appellant Green relies heavily on *State v. Keleher,* 74 Kan. 631, 87 Pac. 738 (1906). That was also a murder case in which the state's chief witness recanted on a motion for new trial. The state relied on two theories for conviction. The first was his alleged participation in a con-

spiracy to steal the victim's money from a barn where it was supposed to have been hidden. The second was the testimony of one Roberts, the confessed murderer, to the effect that the defendant had been at the scene of the crime, a railroad track far removed from the barn, and that he helped dispose of the victim's body and partook of the fruits of the robbery which motivated the killing. On Keleher's motion for new trial Roberts recanted this testimony, saying that Keleher had been nowhere near the scene and that he, Roberts, was alone responsible for the murder.

In overruling the motion the trial court indicated its belief in Roberts' later testimony, finding "that the evidence is insufficient to prove that the defendant was present at the time and place of the killing of the deceased and participated in the act of killing, but holding that it is sufficient to prove him guilty as accessory before the fact, and as a conspirator under the law." (p. 640.)

This court found that the defendant's participation in the alleged conspiracy—to steal at a place wholly different from the murder scene—was insufficient standing alone to support a murder conviction. As to the recanting testimony concerning aiding and abetting at the actual scene the court said:

"To determine the credibility of witnesses and all the facts, including the final conclusion of guilt or innocence, are the especial provinces of a jury and not of a court. The court evidently believed a part of the testimony given by Roberts on the motion for a new trial, which was in direct contradition of his evidence on the trial. If the jury had heard this additional testimony they might have determined its credibility the same as did the court, or they might have believed the entire statement made by Roberts at the last and entirely discarded his story told on the trial. A jury should have the opportunity to hear all of his testimony and to determine what should be believed. Where the probable effect of the newly discovered evidence is doubtful or impossible to determine, a new trial should be granted." (p. 643.)

Despite the fact that the trial court in *Keleher* believed the recanting testimony, appellant here argues that the foregoing language means the trial court may not weigh such evidence, but is bound to order a new trial so that a jury may weigh it. Others have urged the same construction, but that contention was rejected as long ago as *State v. Turner*, 121 Kan. 364, 247 Pac. 427 (1926):

"In behalf of the defendant objection to this ruling [denying a new trial] is urged upon the ground that the court undertook to pass upon the credibility of the evidence and thereby invaded the province of the jury, *State v. Keleher*, 74 Kan. 631, 643, 87 Pac. 738, being quoted from in support of that contention. That case, as is mentioned in the defendant's brief, has already been referred to as very exceptional. (*State v. Fleeman*, 102 Kan. 670, 171

Pac. 618.) Moreover, since the Keleher decision a new code has been adopted which expressly provides that on the hearing of a motion for a new trial on the ground of newly discovered evidence the opposing party may rebut the new evidence. (R. S. 60-3004.) The provision cited applies in criminal as well as civil cases. *(State v. Wellman,* 102 Kan. 503, 170 Pac. 1052.) There could be little object in presenting rebuttal testimony unless the judge was expected to weigh conflicting evidence, and to refuse to set aside a verdict merely because of new testimony which is important if true, but which he regards as incredible." (pp. 367-8.)

That principle was reaffirmed the following year in *State v. Buton,* 124 Kan. 509, 260 Pac. 634 (1927), where a recanting affidavit was offered in support of a motion for a new trial. This court said:

". . . In this situation appellant contends that it is the function of the jury to weigh the testimony, and that there was nothing for the court to do but to grant a new trial. This contention cannot be sustained. *The court, not the jury, passes on the motion for a new trial, and any evidence offered in support of it. Obviously, a court is not compelled to give credence to false testimony offered in support of a motion for a new trial.* One who recants his sworn testimony in court necessarily raises a serious question as to his own veracity." (pp. 509-10. Emphasis added.)

The trial court's duty to weigh the recanting testimony was again recognized in *State v. Birzer,* 126 Kan. 414, 268 Pac. 842 (1928) and *State v. Smith,* 126 Kan. 670, 271 Pac. 289 (1928).

In our more recent cases we have put it a little differently, but the tenor of our decisions has been the same. Thus:

"A new trial should not be granted on the ground of newly discovered evidence unless the district court is satisfied the evidence would probably produce a different verdict, and the credibility of the evidence offered in support of the motion is for the district court's consideration. Our appellate review of the order denying a new trial is limited to whether the district court abused its discretion." *(State v. Campbell,* 207 Kan. 152, 154, 483 P. 2d 495.)

Similarly:

"Where a new trial is sought on the basis of the recanting testimony of a prosecution witness, the weight to be given such testimony is for the trial judge passing on the motion for a new trial." *(State v. Theus,* 207 Kan. 571, 485 P. 2d 1327, Syl. ¶ 7.)

As to *Keleher,* it is apparent that despite repeated rejections of the contention by this court, litigants over the years have misconstrued that case. They insist it means that where a material prosecution witness recants, the defendant, as a matter of right, is entitled to have a jury pass on the credibility of the conflicting testimony at a new trial. Any such construction of that case is disapproved.

As we said in *State v. Buton,* supra, "The court, not the jury, passes on the motion for a new trial, and any evidence offered in support of it."

Applied to this case, our firmly established rule authorized and required the trial court do just what it did, *i. e.,* to determine the credibility of Frames' recanting testimony and grant a new trial only if satisfied that it was true. Without reviewing the testimony summarized above, we are satisfied that there was nothing which compelled the trial court to believe Frames' latest story. On the contrary, the court gave cogent reasons for its disbelief. There was therefore no abuse of discretion in overruling the motion for a new trial.

Defendant suggests that Frames' new version is entitled to credence because it was "corroborated" by the testimony of a penitentiary inmate. The inmate testified to the effect that Frames, after his commitment to the penitentiary, told the witness he had lied at Green's trial. Such a statement by Frames corroborated nothing. As a prior consistent statement it would have had probative value only if made prior to his original testimony. See *State v. Petty,* 21 Kan. 54, Syl. ¶ 2; 98 C. J. S., *Witnesses,* § 648 (3); 58 Am. Jur., *Witnesses,* § 826. The trial court correctly gave this testimony no weight.

The judgment is affirmed.

APPROVED BY THE COURT.