No. 101,336

STATE OF KANSAS, *Appellee*, v. JAMIL MICHAEL FULTON, *Appellant*.

(256 P.3d 838)

Opinion filed August 5, 2011.

*Jonathan B. Phelps*, of Topeka, was on the brief for appellant.

*Natalie Chalmers*, assistant district attorney, *Chadwick J. Taylor*, district attorney, and *Steve Six*, attorney general, were on the brief for appellee.

The opinion of the court was delivered by

MALONE, J.: Jamil Fulton was convicted of first-degree murder in violation of K.S.A. 21-3401(a) and criminal possession of a fire-

arm in violation of K.S.A. 21-4304(a)(3). He received a hard 25 life sentence for the off-grid murder offense and a concurrent 8 months' imprisonment for the criminal possession of a firearm conviction. We review the off-grid conviction on direct appeal pursuant to K.S.A. 22-3601(b)(1).

The issues on appeal, and our accompanying holdings, are as follows:

1. Was there sufficient evidence to convict Fulton? Yes.
2. Did the district court err in denying Fulton's motion for a new trial? No.
3. Is Fulton entitled to a new trial because of his counsel's failure to request   that his trial be severed from his codefendant's trial? No.

## FACTS

A jury convicted Jamil Fulton of the murder of Christopher Caraway. Caraway was a member of a subdivision of the Cripps gang. Fulton was a member of the Traveling Vice Lords gang.

On Saturday, July 16, 2005, Officer Charles Nadeau of the Topeka Police Department saw Caraway at a Mexican fiesta in the Oakland area of Topeka, Kansas. Several months earlier, Caraway had told Nadeau that he was leaving town because of a "bad deal that he had made." At the fiesta, Nadeau asked Caraway why he was back in town. Caraway answered that he was just back in town over the weekend to visit family, that he had not resolved the earlier situation, and that some members of the Traveling Vice Lords gang were looking for him.

Later, at the fiesta, there was a run-in between Caraway's friend, Antony Sullivan, and Antuan Harness. Sullivan told Harness that he wanted to fight him. A group of people gathered, including Fulton, Rashawn Anderson, and Caraway. Caraway also offered to fight; however, the police dispersed the group before a fight broke out.

On July 17, 2005, Caraway and his friend, Leonardo Martinez, were visiting Jasmine Phelps at the Highland Park Apartments in Topeka. Shortly before midnight, Caraway and Martinez left Phelps' residence and were walking the short distance to Martinez'

residence when a group of people approached and started shooting at them. Martinez and Caraway ran in different directions in an attempt to flee the shooters. Martinez returned to the Phelps apartment and told Phelps and her little brother some of the people that Caraway saw at the fiesta were shooting at Caraway and him. Martinez, however, was never able to identify the shooters.

On the morning of July 18, Caraway was found dead in a parking lot near where Martinez and he had separated when the shooting began. He died of a single bullet wound to his back that was approximately 9 mm in size. Police marked multiple bullet holes and recovered bullet fragments and casings from the crime scene. In processing the crime scene, it was concluded that at least three different weapons were used in the shooting.

Several neighbors testified to the events surrounding the shooting. One neighbor, Latonya Boyd, explained that she did not see the shooters, but she heard multiple gunshots. Shortly after hearing the gunshots, she saw two cars, a red-colored one and a champagne-colored one, quickly leaving the area in the same direction. Another neighbor, Gary Johnson, stated his wife, Koren Johnson, woke him up because she heard gunshots. He ran to the front window and looked out onto the parking lot. He saw three black men chasing another black man, and two of the men were also shooting at the man being chased. He then saw all three men return, and the two shooters got into a red Pontiac Grand Am, while the third man got into a silver or grayish Dodge Stratus. The cars then left in the same direction. Gary Johnson further explained that he never saw the man who got into the Dodge Stratus fire a weapon, although Johnson heard gunfire before he looked out the window.

Koren Johnson testified that early Monday, July 18, around 12:45 to 1 a.m., she heard 6 to 10 popping noises. She thought the noises were gunshots. She got out of bed to look out her front window. She noticed four black men running in front of her apartment. She recognized Robert Patterson as the second person running by. She did not recognize any of the other men.

Other witnesses provided additional details. Tranice Nance was at the Highland Park Apartments partying with Fulton and others.

She became drunk and high, and she then went to her car—a metallic gray Dodge Intrepid—to listen to music. While in the car, she heard gunfire. She scrunched down in the seat and then Fulton jumped into her car and said, "People are shooting, let's go." She then drove away.

Lindsay Wenniham was also in the neighborhood of the Highland Park Apartments at the time of the shooting. She owns a red Pontiac Grand Am. She was with her boyfriend, Lindsey Wallace, who was there to deal drugs to Fulton. Wenniham was sitting in the front passenger seat of her car when she heard gunshots. Soon after, Wallace jumped into the driver's seat of her car and began backing out to leave, Anderson jumped into the car, and they drove away.

Wallace was the only individual who testified that he actually saw the shooting take place. Wallace testified that he was rolling a blunt with Fulton when he saw Caraway with another person. Someone yelled, "There's Chris," and people started shooting. According to Wallace, as Caraway ran off, Fulton, Harness, and Anderson chased after him. Fulton pulled out a gun and started shooting at Caraway. Wallace then jumped into Wenniham's car, started it, and backed up to leave. As he was backing up, Anderson jumped into the car, and Wallace drove away. At the time that Wallace testified, he was facing drug charges. Wallace stated he was involved in on-going plea bargain negotiations for the drug charges and that he was testifying in hopes of receiving a plea bargain.

Two additional witnesses, Alonzo Lax and Ian Hudson, testified that they heard Fulton discussing the murder and taking credit for shooting Caraway. Lax testified that he was hanging out at a friend's house when he overheard a conversation in which Fulton admitted to shooting Caraway. According to Lax, codefendant Robert Patterson, the other alleged shooter, was also there when Fulton said that he was one who shot Caraway. Lax was specifically asked on direct examination by the prosecutor if the codefendant "Robert Patterson agreed that Jamil Fulton was probably the one that did it?" Lax answered the question in the affirmative without any objection by either Patterson or Fulton.

Hudson testified that in December 2005, Fulton, he, and several other individuals were shooting dice at Kajun Jackson's house in Topeka. Hudson testified that there he overheard Fulton brag that he had shot Caraway in order to earn his gang stripes. Jackson, however, testified that no such conversation occurred. Both Hudson and Lax were testifying in order to receive favorable plea deals.

Fulton presented testimony that Hudson and Lax were committing perjury in order to receive favorable plea deals. Robert Green testified that Lax was going to testify that Fulton committed the crime even though Lax "didn't know for sure" who committed the crime. Green further testified that Lax told him he was not present at the shooting and his testimony would be what "he'd hear from other people that Jamil did." Further, Green testified that Hudson and Lax were together in the Shawnee County jail and spoke with each other to "make stories together that match."

Fulton was convicted of first-degree murder and criminal possession of a firearm for the murder of Caraway. His motion for a new trial based on insufficient evidence was denied. Patterson, Fulton's codefendant, was also charged with murder in the first degree, but the jury was unable to return a verdict on the charge against him.

Additional facts will be provided as necessary to the analysis.

## DISCUSSION

*There was sufficient evidence to convict Fulton.*

Fulton argues that the evidence was insufficient to convict him of first-degree murder.

### Standard of Review

Our standard of review is well settled. In reviewing a challenge to the sufficiency of evidence

"we view [all] the evidence in a light most favorable to the prosecution to determine whether a rational factfinder could have found the defendant guilty beyond a reasonable doubt. See *State v. Vasquez*, 287 Kan. 40, 59, 194 P.3d 563 (2008); *State v. Saleem*, 267 Kan. 100, 104, 977 P.2d 921 (1999). We do not weigh the evidence or reassess witness credibility. See *Ives v. McGannon*, 37 Kan. App. 2d 108, 124-25, 149 P.3d 880 (2007)." *State v. Trussell*, 289 Kan. 499, 503, 213 P.3d 1052 (2009).

*Analysis*

Fulton argues that there was insufficient evidence to convict him. First, Fulton contends that the witnesses, specifically Wallace, "lacked any credibility upon which a rational factfinder could rely . . . that Fulton [was involved]." Second, the defendant claims that there was no evidence that his gun fired the shot that struck Caraway. Finally, the defendant claims that there was no evidence that he aided or abetted. The State replies that Fulton is impermissibly asking this court to reweigh evidence.

Fulton argues that Wallace lacked credibility. However, Wallace's credibility was front and center at the trial for the jury to evaluate. Wallace testified that he was providing testimony in hopes of leniency, but no deals were currently in place at the time of his testimony. Wallace's hope of a plea deal was disclosed to the jury during his examination, and the trial judge properly instructed the jury that, in determining the weight and credit to be given to the testimony of each witness, it had the right to use common knowledge and experience in regard to that testimony. See PIK Crim. 3d 52.09.

Fulton was provided the "crucial" opportunity of inquiry into whether Wallace had made a deal with the State. See *State v. Davis*, 237 Kan. 155, 158, 697 P.2d 1321 (1985); see also *State v. Sharp*, 289 Kan. 72, 98, 210 P.3d 590 (2009) (recognizing the importance of " 'inquiry into whether the witness was offered any "arrangement or deal" by the State in exchange for his testimony' "). It is not the function of this court "to weigh conflicting evidence, to evaluate witnesses' credibility, or to redetermine questions of fact." *State v. Johnson*, 289 Kan. 870, 888, 218 P.3d 46 (2009). And Fulton cannot demonstrate that Wallace's plea bargain negotiations rendered Wallace's testimony incredible as a matter of law. Fulton's argument is without merit.

Fulton next argues:

"There were no facts upon which a rational factfinder could have found that even if Fulton had fired a gun in the direction of Caraway that the gun he fired—out of many that were fired in Caraway's direction—fired the shot that struck Caraway."

The record on appeal does not support Fulton's assertion. The State presented evidence that Caraway died from a 9 mm bullet. According to a prosecution witness, Fulton stated that he shot Caraway with a 9mm handgun. Again, we do not redetermine questions of fact. *Johnson*, 289 Kan. at 888.

Fulton's final argument is there was no evidence that Fulton "aided or abetted any other shooter." Fulton contends that he was a "mere associate" to the crime. The record on appeal, once again, does not support Fulton's argument. An eyewitness testified he saw Fulton chasing and shooting at Caraway. Fulton presents no evidence as to how the facts of his case show that he was a "mere associate."

Viewing the evidence in the light most favorable to prosecution, we conclude there was sufficient evidence to convict Fulton.

*The district court did not err in denying Fulton's motion for a new trial.*

Fulton next contends that the district court erred in denying his motion for a new trial.

### *Standard of Review*

Our standard of review of this issue is well established:

"The decision to grant or deny a motion for a new trial rests in the sound discretion of the district court. *State v. Flynn*, 274 Kan. 473, 513, 55 P.3d 324 (2002). Judicial discretion is abused only when no reasonable person would take the view of the district court. The party who asserts abuse of discretion bears the burden of showing it. See *State v. Moses*, 280 Kan. 939, 945, 127 P.3d 330 (2006). The abuse of discretion standard includes review to determine that the discretion was not guided by erroneous legal conclusions. *State v. White*, 279 Kan. 326, 332, 109 P.3d 1199 (2005)." *State v. Stevens*, 285 Kan. 307, 319, 172 P.3d 570 (2007).

### *Analysis*

Fulton argues a new trial was warranted because (1) evidence was not available to Fulton concerning the full extent of the benefits that Wallace, Lax, and Hudson received; (2) his trial counsel "did not present the full extent" of the evidence concerning Fulton's absence from Kansas at the time Hudson testified that Fulton stated he committed the crime; and (3) evidence was not available

to the extent that Wallace, Lax, and Hudson fabricated their stories.

On Fulton's first point, Wallace, Lax, and Hudson all testified concerning their existing or pending plea bargains. As already mentioned, Fulton was provided the crucial opportunity to inquire whether the witnesses had any arrangements or deals with the State in exchange for their testimony. See *Davis*, 237 Kan. at 158. Fulton presents no argument as to what additional evidence the jury needed to hear regarding the potential plea-bargain benefits Wallace, Lax, and Hudson may have received.

Fulton argues in his second point that trial counsel erred because he "did not present the full extent" of possible evidence concerning Fulton's absence from the state. Fulton argues that a new trial should have been granted so the evidence of his absence from the state could be introduced. At the hearing on the motion for a new trial, several witnesses testified Fulton was absent from the state during the time that Hudson supposedly overheard Fulton brag to Jackson that he had killed Caraway. It must be noted that these witnesses also testified that they were available to be called as witnesses during the trial. In addition, the jury heard the testimony of Jackson. Jackson not only denied Hudson's claim that Fulton bragged to Jackson about killing Caraway; Jackson testified that Fulton never discussed with him the murder of Caraway. The truthfulness of Hudson's testimony that he overheard Fulton brag about killing Caraway was challenged before the jury.

The test for determining whether a new trial is warranted on the ground of newly discovered evidence has two parts: (1) whether the defendant has met the burden of establishing that the newly proffered evidence could not, with reasonable diligence, have been produced at trial and (2) whether the evidence is of such materiality that it would be likely to produce a different result upon retrial. *State v. Cook*, 281 Kan. 961, 992, 135 P.3d 1147 (2006). Fulton's argument fails each part of this test. The witnesses who would testify about Fulton's absence from the state were available to be called at Fulton's trial. Also, given the denial by Jackson that Fulton made these incriminating statements, the evidence would not have been new evidence that Hudson's testimony was not credible.

Finally, Fulton argues his motion for a new trial should have been granted since new evidence came to light revealing that the witnesses Wallace, Lax, and Hudson fabricated their testimony. However, at the motion for a new trial, the district court appropriately noted that the testimony largely consisted of people testifying that "other people testified falsely at trial." The district court considered the testimony and found most of it was rooted in hearsay and was not credible. Importantly, the district court considered Lax's recantation and found it not to be credible. As to Green's testimony that Wallace, Lax, and Hudson were fabricating the story, the district court noted that the jury heard the same testimony at trial and rejected it.

The trial judge conducted a full hearing on Fulton's motion for a new trial. In a thorough and well-delivered opinion, the judge appropriately weighed the evidence and determined the credibility of the witnesses testifying at the motion for new trial. The district court did not abuse its discretion in denying the defendant's motion for a new trial. See *State v. Green*, 211 Kan. 887, Syl. ¶¶ 2, 5, 508 P.2d 883 (1973) (holding in a first-degree murder case that the district court did not abuse its discretion in denying a motion for a new trial based on a State's material witness' recantation and stating where a new trial is sought on the basis of the recanting testimony of a prosecution witness, the weight to be given such testimony is for the trial judge to determine.

Fulton has failed to show that the district court abused its discretion in denying a new trial.

*Fulton is not entitled to a new trial because of his counsel's failure to request that his trial be severed from his codefendant's trial.*

Fulton argues that his counsel should have moved the district court to sever his trial from the trial of codefendant Patterson. He alleges that severing was necessary because Lax testified that Patterson agreed with Fulton's statement that Fulton was probably the one who fired the bullet that killed Caraway. Fulton relies on *Bruton v. United States*, 391 U.S. 123, 137, 88 S. Ct. 1620, 20 L. Ed. 2d 476 (1968). In *Bruton*, the Supreme Court held that admission of a codefendant's confession that implicated the defend-

ant at joint trial constituted prejudicial error even though the trial court gave a limiting instruction. *Bruton*, 391 U.S. at 137 ("Despite the concededly clear instructions to the jury to disregard Evans' inadmissible hearsay evidence inculpating [the defendant], in the context of a joint trial we cannot accept limiting instructions as an adequate substitute for [the defendant's] constitutional right of cross-examination.").

Fulton's situation is distinguishable because the alleged error occurred when Lax testified that the codefendant agreed with Fulton's statement that Fulton was the shooter. Additionally and more importantly, Fulton is not alleging that the district court erred in admitting Lax's statement into evidence. Instead, Fulton alleges that his counsel was negligent because he failed "to request a separate trial [and therefore] fell below the standard of a reasonable attorney." Fulton is presenting an ineffective assistance of counsel argument for the first time on appeal because no motion to sever the joint trial was filed.

Ineffective assistance of counsel claims cannot generally be raised for the first time on appeal. See *Trotter v. State*, 288 Kan. 112, 127-28, 200 P.3d 1236 (2009). In *Trotter*, we elaborated:

"On several occasions, we have considered whether the exceptions relating to ineffective assistance of counsel can be applied when raised for the first time on appeal, and, as a general rule, we have concluded the exception cannot be applied. See, *e.g.*, *State v. Gleason*, 277 Kan. 624, Syl. ¶ 5, 88 P.3d 218 (2004). Rather, we have generally determined a district court must consider the evidence to determine the two-prong test for establishing ineffective assistance of counsel, which requires a defendant to 'show "(1) counsel's performance, based upon the totality of the circumstances, was deficient in that it fell below an objective standard of reasonableness, and (2) [defendant] was prejudiced to the extent that there [was] a reasonable probability [of success], but for counsel's deficient performance." [Citations omitted.]' *State v. Smith*, 278 Kan. 45, 51-52, 92 P.3d 1096 (2004); see *Bledsoe*, 283 Kan. at 90-91. In most cases, we would remand to the district court for an evidentiary hearing on at least the first prong of the ineffective assistance of counsel standard. See, *e.g.*, *Lujan v. State*, 270 Kan. 163, 14 P.3d 424 (2000); *State v. Van Cleave*, 239 Kan. 117, 119-21, 716 P.2d 580 (1986).

"We have rarely found an exception to the general rule that an ineffective assistance of counsel claim should be first considered by the district court, but did so on at least one occasion in *Laymon v. State*, 280 Kan. 430, 444, 122 P.3d 326 (2005), under circumstances we recently labeled 'extraordinary.' *State v. Swisher*, 281 Kan. 447, 450, 132 P.3d 1274 (2006). In our decision in *Laymon*,

we held that the two prongs of ineffective assistance—deficient performance by counsel and prejudice as a result of the deficiency—were demonstrated as a matter of law by the appellate record and, therefore, remand to the district court was not necessary." 288 Kan. at 127-28.

Fulton points to no set of facts that would make this situation "extraordinary," and prejudice is not apparent "as a matter of law by the appellate record." See 288 Kan. at 128. Therefore, this issue is not appropriately before us. See *State v. Gleason*, 277 Kan. 624, 647, 88 P.3d 218 (2004) ("This specific allegation of ineffective assistance of counsel was not preserved at the district court, either at trial or the September 5 [posttrial motions] hearing. It cannot be considered now.").

Affirmed.

MICHAEL J. MALONE, District Judge, assigned.